## STODDARD *et al. v.* VILLAGE OF SARATOGA SPRINGS.

(*Supreme Court, General Term, Third Department.* March 16, 1889.)

1. MUNICIPAL CORPORATIONS—SEWERS—DISCHARGE INTO NATURAL STREAM—NUISANCE.
    It is no defense to an action against a municipal corporation for discharging the contents of a sewer into a natural stream that the sewer was constructed partly on private property.

2. SAME.
    The contract for the construction of the sewer having been made by the defendant, the fact that it raised the amount expended by an assessment on the adjoining owners does not alter its liability.

3. SAME.
    Nor can the defendant protect itself on the ground that it was not authorized to construct the sewer.

4. SAME.
    Nor is it any defense that the injury arises from the use of the sewer by third persons, who connect their houses with it, and discharge sewage into it.

Appeal from judgment on report of referee.

The referee delivered the following opinion in connection with his report:

"The complaint in this action is to recover against the defendant, a municipal corporation, for having caused an alleged nuisance upon the premises of the plaintiffs for six years previous to the commencement of this action, by reason of the overflow of defendant's sewer, which action was commenced the 2d day of October, 1885. The answer puts in issue all the material allegations of the complaint, and further alleges that the overflow or drain is caused by defects in the land of Caroline M. Searing, which is not the property of the defendant, and is the private property of the said Searing. The charter of the defendant, passed March 26, 1866, after describing a certain territory of lands and inhabitants therein, prescribes that the same shall be known by the corporate name of the 'Village of Saratoga Springs, and by that name they and their successors forever hereafter shall and may have perpetual succession, and shall be persons in law capable of suing and being sued, and be capable of purchasing and holding and conveying any estate, real and personal, for the public use of the village, and for erecting any public buildings, constructing aqueducts, reservoirs, water-works, public sewers,' etc. By chapter 271, Laws 1874, entitled 'An act to amend an act entitled "An act to authorize the construction of sewers in the village of Saratoga Springs,"' passed April 28, 1874, section 3 provides that 'whenever a majority of the owners or occupants of premises upon any street or streets * * * in said village shall petition the board of trustees of said village to lay a sewer

along said street or streets of said section or portion of said street or streets, clearly designating by maps or other proper description accompanying said petition the portion of said street or streets, and the distance thereon, and the desired course of such sewer, and that said sewer be connected with the creek or main sewer at a point to be designated in said petition, then the board of trustees of said village are hereby authorized and empowered to grant the request of said petitioners, and to cause a sewer to be laid along such street or streets, * * * as set forth in said petition, and connect the same with the creek or main sewer.' Power is further given the board of trustees to cause the proper survey and maps, plans and profiles to be made. Section 4 further provides the manner and mode of letting the contract by the board of trustees to construct said sewer, and says: ' Before awarding any contract for the construction of such sewer, the contractor shall execute to the village of Saratoga Springs, in such form and manner as such board shall prescribe, an undertaking or bond in the sum of at least twice the amount of the aggregate of such contract price, with two sureties, who shall duly justify, conditioned for the faithful performance of the contract and the proper construction of such sewer, in conformity with the plans and specifications adopted by said board of trustees.' By section 5, ' the cost of constructing such sewer shall be assessed by the board of trustees upon the property adjoining said sewer, and such other property which said board may deem to be benefited by said sewer, or may at any time enjoy the use of said sewer;' and in making the assessment the board is to be guided ' by the valuation of the property assessed, as the same shall appear upon the village assessment roll at the time of such assessment,' and power is given them to enforce such assessment ' in the same manner as other taxes are collected in said village.' Under section 6, said trustees shall prescribe rules for the use of such sewers; ' and, in case any such sewer shall require repairs, said trustees shall make the same, and charge and assess the cost thereof upon the property enjoying the use of the same, in like manner as the cost of constructing the same was assessed and collected.'

"On the 13th day of March, 1876, the board of trustees of defendant received a petition signed by G. W. Langdon and twelve others, representing that they were a majority of ' owners and occupants of premises in that part of the village herein described and abutting thereon, and that they are greatly in need of a sewer along the line of the present walled creek between Walworth and Church streets, and therefore earnestly petition your honorable body to construct a sewer, commencing at the culvert on Walworth street, through the lands of James M. Marvin and the United States Hotel wash-house lot, to and through Harrison and Lawrence streets, to Walton street.' Divers actions were taken by the board of trustees in reference to the petition, until the 1st of May, 1876, when the board of trustees awarded the contract to build said sewer to Mervin Adams; and subsequently, on the 8th day of May, 1876, by virtue of power given its president, a written contract was entered into between the village of Saratoga Springs, by S. H. Richards, president, and said Adams, giving in detail the contract and specifications for the building of said sewer, which sewer was to be laid through Lawrence and Harrison streets, from Walton street to the south-west corner of the Marvin and Benedict lot, and all work to be completed in June, 1876. As appears by the evidence, the sewer was constructed from a point at Walton street where it intersects Lawrence street, and ran a southerly course through Lawrence to Harrison street; thence on a southerly course through Harrison street to the intersection of Harrison and Division streets; thence into and through the United States wash-house grounds, a southerly course; thence across Cherry street; thence southerly through a lot known as the ' Marvin and Benedict Lot,' and marked ' A. R. R. Co.' on the map in evidence, to the south bounds thereof; and there the inclosed sewer stopped, being within about ten feet of

the Waterbury brook, and that distance it ran in a culvert to the brook, which was built under the same contract. Immediately after the building of this sewer the lands along the line of this sewer connected with it, also including the United States Hotel wash-house. In constructing this sewer there were five street basins, located at different points, connected with it to carry off the street surface water which formed thereon.

"After these several connections were made with this sewer the sewage, after leaving the sewer, flowed into the Waterbury brook on Walworth street; thence down said brook south about one hundred feet, until it reached the plaintiffs' lot on the west side; then turned an easterly course across the plaintiffs' lot; in other words, following the bed of the brook as it flowed, which brook was walled up in Walworth street. Complaint was made to the board of trustees in 1876 by one Stratton, who lived on the second lot east of plaintiff, in reference to the alleged nuisance on the plaintiffs' premises caused by the excrement coming from the sewer, and the trustees took action thereon on the 21st day of November, in the same year, as follows: 'Mr. Brintnall moved that a committee be appointed with power to repair the sewer across the lot west of William Stratton's premises on Washington street, expenses to be paid from the miscellaneous fund. Carried. Mr. Brintnall appointed as such committee.' Mr. Brintnall, one of the trustees of the defendant, then made a contract with Thomas Eldridge to build a sewer across the plaintiffs' lot, and a little corner of the Searing lot, for $50. Eldridge went in and put in the sewer, and his bill was audited by the board of trustees, and he was paid therefor by receiver of taxes of the village of Saratoga Springs, and paid by the village. It is proper to say here that this sewer was put in without the consent or knowledge of the plaintiff, Stoddard, across her lot, and that after this relief sewer was put in it failed to carry off the water and excrement which came down the creek out of the Clinton and Harrison street sewer. During every year, from the time of putting in of such sewer up to the commencement of this action, the proof shows that the sewage flowing from this sewer and running into the brook overflowed the bank of the creek for a length of time, which caused an offensive odor to arise and a disagreeable smell in the premises of the plaintiffs, and that large amounts of excrement from water-closets were continually in the creek, and rested upon and remained on the lands of plaintiffs after the flow had subsided, thereby greatly depreciating the rental value of the premises. For this the plaintiffs claim they have made out a good cause of action against the defendant, and are entitled to recover therefor. The defendant's counsel, however, insists that no recovery can be had, for the reason that said sewer, so constructed, was put down without authority of law; that it is not defendant's sewer; that it runs through private grounds of which defendant has no control; and that the board of trustees acquired no jurisdiction by the petition presented to put down said sewer; and that the claim, if any, is against the individuals who created the sewage and nuisance. This case is clearly distinguished from the case of *Searing* v. *Saratoga Springs*, 39 Hun, 307, for there the sewage complained of was caused by a defective pipe on her land, which was put down with the plaintiff's knowledge and consent. It was there held that she could remove it, and thereafter the court says: 'If any sewage be illegally or improperly thrown upon the land by the defendant, she can then probably recover the damages which she may sustain.'

"The learned counsel for the defendant is undoubtedly correct in claiming that the village had no authority to lay the sewer through private grounds, and those acts were void as between the village and the owners of the property along the line of the street where the sewer was laid. In other words, a portion of this sewer was laid in private grounds, where defendant's agents had no jurisdiction to lay it, and so far the case at bar is like *In re Rhinelander*, 68 N. Y. 105, which was a proceeding to vacate an assessment to pay

for building a sewer along private grounds, and in that case the court held that the assessment was illegal and void. *McCaffrey* v. *Albany*, 11 Hun, 613; *Searing* v. *Saratoga Springs*, 39 Hun, 307.

"And no doubt the object in running the sewer through these private grounds, directly or nearly so to the creek, was to avoid expense in running the sewer west through Division street to Walworth street, and then down Walworth street to the creek, where it emptied into the Walworth-Street brook. I think it is too late, after the sewer has been put down by the trustees of the defendant acting *bona fide* and within the scope of their authority, and damages subsequently arise, to claim that their acts are void because a portion of the sewer ran through private lands, and that the petition upon which the board of trustees acted did not represent a majority of the owners or occupants of the property along the line of the sewer, or that the petition was not accompanied with a map, or that the sewer, as actually laid and built, did not exactly conform to the petition, and that defendant never used the sewer. In fact, there is no proof before me that the petitioners did not represent a majority of the owners or occupants along the line of the street. The defendant's trustees are public officers, and full faith and credit must be given to their acts when they are clothed with general authority and jurisdiction over sewers. These questions would naturally arise between the village and land-owners along the line of the sewer, on levying the assessment to pay for building the sewer, and very properly, too, as they did in the following cases, holding that their acts were *ultra vires* and void. *In re Rhinelander*, 68 N. Y. 105; *People* v. *Haines*, 49 N. Y. 587.

"Assuming that the petition gave the board of trustees jurisdiction to lay the sewer along the line of Harrison street and Lawrence street, and they having acted upon it, which was within the scope of their authority, and built the sewer therein, then so far as the village is concerned, under the statute, it has the right to control it through its officers as against any person; and the plaintiffs, for the purpose of abating the nuisance on their premises, have no right to obstruct the sewer or turn it upon either of the streets; nor have the land-owners or occupants on the line of this sewer in the above streets any authority to obstruct or interfere with the sewer, for the laws of 1871, c. 673, § 7, says: 'Any person who shall willfully injure, obstruct, or interfere with the said sewers, without the permission of said trustees, shall be liable to a fine of not exceeding fifty dollars, or imprisonment not exceeding three months.'

"The statute of 1874, being an amendment of the laws of 1871, requires the trustees to let the contract for the building of the sewers to the lowest bidder, and the contractor to give a bond to the village of Saratoga Springs conditioned for the faithful performance of the contract, and the cost of repairing the sewers is made in the same manner as the construction. Said trustees shall prescribe the rules for the use of such sewers, and have power to prevent any excavations in streets or otherwise which shall interfere with the use of such sewers. Then, in fact, this sewer was laid down by order of defendant through its board of trustees, and the defendant through its board has the right, and no one else, to control it. But in the manner and mode of construction the trustees continued the sewer through the private grounds of the United States Hotel wash-house, and the Marvin and Benedict lot; and it is insisted by the defendant's counsel that the act of the trustees did not bind the village by reason of any damages arising therefrom; that it was not within the scope of their authority, and they had no jurisdiction. 2 Dill. Mun. Corp. §§ 969, 970; *Cuyler* v. *Rochester*, 12 Wend. 165; *Anthony* v. *Inhabitants of Adams*, 1 Metc. 284; *Browning* v. *Owen Co.*, 44 Ind. 11; *Mayor* v. *Clunliff*, 2 N. Y. 165; *Smith* v. *Rochester*, 76 N. Y. 506, 512; *Cushing* v. *Bedford*, 125 Mass. 526; *Lemon* v. *City of Newton*, 134 Mass. 476. The laying of the sewer down to Division street only would be of no use to the inhabitants

along the line of the street; therefore an outlet must be had, and the petitioners no doubt took this into consideration when they signed the petition, and consent was obtained from those who claimed to represent or own the property that the sewer be laid through the private grounds.    This consent, as between the village and land-owners, was entirely void, and no easement was granted.    2 Rev. St. p. 134, § 6; *Wiseman* v. *Lucksinger*, 84 N. Y. 31; *Cronkhite* v. *Cronkhite*, 94 N. Y. 323–328.

"The question then arises, the Clinton and Harrison streets sewer being used, and excrement running from it into the sewer through the private grounds, and reaching the plaintiffs' premises and being dumped thereon, and creating a foul and noisome stench, who is responsible for the damages?' It strikes me that the sewer being built to Division-Street crossing, and from there the sewer finding its way by natural courses or artificial means onto the premises of plaintiffs, gives them a right of action against the village, and it would seem to be a grave question whether or not the trustees were not acting *bona fide* and within the scope of their authority, in finding an outlet for the sewer after it reached Division street proper, and if so defendant would clearly be liable.    In the case of *Lee* v. *Village of Sandy Hill*, 40 N. Y. 443, the action was brought for trespass upon real estate against the defendant, a municipal corporation, for having trespassed upon plaintiff's land in removing a fence, through its officers or trustees, in the widening of a street; and it was there held ' that as natural persons are liable for the wrongful acts and neglect of their servants and agents, done in the course and within the scope of their employment, so are corporations, upon the same grounds, in the same manner, and to the same extent.'    The only officers or persons who represent the corporation are the trustees, and the defendant cannot act except through them; and the court says, in speaking of the trustees: 'As the former exercise all the powers of the corporation, and are its only direct medium of communication with outside parties, they must, in respect to all external relations, be considered as identical with the corporation itself.'    An outlet must be had for the sewer after it reached Division street, and no doubt the trustees, acting *colore officii* and in good faith, saw no other way than through the private grounds to reach the creek at the point designated in the petition.  . Had it been turned into the open creek at Division street, and then passed down the same through its winding, tortuous, and slow course, an unbearable nuisance would have been created, and larger damages liable to accrue to the detriment of the village; and the trustees, under the circumstances, acted wisely and conscientiously in pursuing the course they did.

"Again, it is the general rule that the principal is liable in a civil suit to third persons for the fraud, deceit, concealment, misrepresentation, torts, negligence, and other malfeasances and misfeasances of his agents in the course of his employment, although the principal did not authorize, justify, or participate in, or indeed know of, such conduct, or even if he forbade the acts or disapproved of them.    Story, Ag. § 452, p. 503.    Then, as between the corporation and trustees, who are its agents, when the wrong has been done to a third person, who should respond in damages?    It is the settled law, when one of two innocent persons must suffer from the wrongful acts of a third person, that the principal, who has placed the agent in that position of trust and confidence, should suffer rather than a stranger.    *Hern* v. *Nichols*, 1 Salk. 289.    Even if the principal did not authorize the agent to do the act, as expressed by Paley: ' When the employment offered the means of committing the injury, then the principal becomes liable.'    Dunl. Paley, Ag. 306.    In the case of *Turnpike Co.* v. *City of Buffalo*, 58 N. Y. 639, the action was brought to recover damages for the alleged destruction of a toll-bridge belonging to the plaintiff.    This bridge was within the bounds of the city, and the creek was under the care and control of the defendant, as

a public highway. The common council of the city of Buffalo passed a resolution directing the street commissioners to remove the bridge, which was done; and upon the trial of the case objections were then taken, among others, that if the destruction of the bridge was a tortious act defendant could not be held liable, because such act was not authorized by its charter, and the action by the common council in reference thereto was void; and it' was there held ' that it was immaterial whether the acts of the common council were to be regarded as those of defendant or as those of its agents; it was liable, the tortious acts being in the course of the agency.' *Williams* v. *Village of Dunkirk*, 3 Lans. 45, was an action brought to recover the value of personal property seized and sold by the collector of the village of Dunkirk, a municipal corporation, under a tax-warrant of the trustees of the village, to collect $63, as assessed against the plaintiff, for their repairing a sidewalk on block 517, claiming that it was plaintiff's property. It turned out that plaintiff did not own the block. On the trial plaintiff was nonsuited, and on appeal to the general term it was held that the corporation was liable for the sale of the property by the collector, and judgment was reversed, and new trial granted. In another case reported, the city of New York took proceedings to widen Church street, and in the award made allowed the owner the value of the land and the cost of removing the buildings. The owner of the buildings failed to remove them, and the street commissioner of the city, whose duty it was under the ordinances of the city to open the street, advertised them, and sold them, and they were afterwards removed and taken away by the purchaser. Action was brought against the city, and recovery had therefor, upon the ground that the commissioner acted *bona fide* pursuant to a general authority possessed by him. The act was done for the corporation in the promotion of a proper and lawful enterprise prosecuted by it and under its general authority, and that has been held sufficient to render it liable for the consequences of a deviation from the strict line of such authority. The commissioner was authorized to remove buildings and open the street, but was not authorized to sell the buildings. *Peters* v. *Mayor*, 8 Hun, 405. And in 2 Dill. Mun. Corp. § 971, relating to wrongful acts, which arise out of matters or transactions within the general powers of the corporation, and corporate liability, as to opening or improving streets, or making drains and sewers, the agents or officers of a municipal corporation, under its authority or direction, commit a trespass upon or take possession of private property, without complying with the charter or statute, the corporation is liable in damages therefor. *Thayer* v. *City of Boston*, 19 Pick. 511. This doctrine is again reiterated in the case of *Hawks* v. *Charlemont*, 107 Mass. 414, in a case brought against the defendant for trespass under the following circumstances: An unprecedented freshet occurred in that town, the roads and bridges were greatly damaged, and many of the bridges swept away; and a town meeting was called, and it was voted that the selectmen be the agents of the town to repair the highways and bridges, and that they be empowered to appoint such agents as they thought best; and thereafter various men, with teams, so employed, entered upon the plaintiff's land and drew away large quantities of stone and other material for repairing the roads and bridges, and against the protests of the plaintiff. It was denied by the defendant that plaintiff could maintain the action, and the court says: ' It is manifest that the acts of the selectmen were tortious, and, if they were done by authority of the town, an action of tort will lie against the town. When officers of a town, acting as its agents, do a tortious act, with an honest view to obtain for the public some lawful benefit or advantage, reason and justice require that the town, in its corporate capacity, should be liable to make good the damage sustained by an individual in consequence of the acts thus done. The contrary doctrine would be injurious to the person damaged, and to the agents employed by the town.'.

"The trustees, acting for the benefit of the village of Saratoga Springs, clothed with power given them by the charter and the sewer laws of 1871, and the several acts amendatory thereof, were compelled, in the interest of the village and its inhabitants, to so construct and continue the sewer as to do the least damage possible, and so that the inhabitants along the line of the sewer should receive the greatest benefit. Had they stopped at Division-Street crossing, all their acts would have been of no avail, or had they then turned the sewer into ·the open brook an unbearable nuisance would have been created from that point to the east of the plaintiff;' lot where the creek is covered; but by being carried down to the point designated at the Waterbury brook only two lots would have apparently suffered by the sewage. By the light of the foregoing authorities, the trustees in the discharge of their duties in constructing this sewer acted *bona fide* for the best interests of the village, notwithstanding they went outside of the statute, and beyond the scope of their authority in its construction; and when the sewer was put to use, and the sewage flowing from it into the brook, and passing along down by the plaintiffs' premises, and creating a nuisance thereon, a trespass was committed against the plaintiffs, and their only redress is by action against the village of Saratoga Springs. Authorities need not be cited to show that plaintiffs are entitled to have this stream of water, which passes by or flows through their premises, pure and in its ordinary state, and no one has a right to pollute the stream. This doctrine is fully maintained in the case of *Chapman* v. *City of Rochester*, 23 Wkly. Dig. 424, where the facts were that the city authorities built sewers and a ditch, by which was conducted into a stream of water above plaintiff's premises the sewage from a portion of the city, polluting the waters of the stream, and rendering the plaintiff's premises unwholesome as a place of residence; and the court there held that plaintiff was entitled to an injunction restraining the city authorities from conducting the sewage into the stream, and thence upon plaintiff's premises.

"Guided by these authorities, and the facts in the case, was not this nuisance created by the *bona fide* acts of defendant's agents in the construction and use of this sewer? It was put down and constructed by the trustees in pursuance of their general authority, and is controlled by them and no one else. Plaintiffs have no control over it, and are physically powerless to prevent the evil. By the construction of this sewer how are these plaintiffs affected? The evidence shows a sewer for quite a distance connects with this Harrison-Street sewer from Clinton street; that the inhabitants along the line· of Lawrence, Harrison, and Clinton streets use the sewer; that the surface water from these streets, and which naturally flows therein, covers a large territory, and empties into the sewer, and is carried down into the Waterbury brook, and thus, excrement being thrown onto the plaintiffs' premises, was an unlawful invasion of their rights and property. BOCKES, J., held in the case of *Sleight* v. *City of Kingston*, 11 Hun, 594, that it was the duty of municipal corporations to construct their sewers so that they would not become nuisances. Hence the village was negligent in not providing proper means to take care of the sewage at its outlet without injuring the plaintiffs' property.

"If I am mistaken as to the law under the facts of this case, it is hoped that the appellate tribunal will so decide, and correct any errors. It is an important case to the village and the plaintiffs, as well as to the inhabitants who use this sewer, and upon a full and close examination of the authorities I am unable to come to any other conclusion. It is proper to state, however, that the defendant is amply provided with power now given it by statute to condemn the lands where the sewer runs through private grounds, and appropriate the same for sewer purposes, and any other lands necessary for its outlet, so that it will not make a nuisance. Chapter 136, Laws 1887, § 74. That under the circumstances plaintiffs are entitled to an injunction restraining the village authorities from

conducting the sewage into the Waterbury brook, and thence upon plaintiffs' premises, but that the issue of such injunction should be withheld for six months, to enable defendant to adopt some other way of disposing of the sewage. The rule as laid down by the court of appeals, as to the measure of damages, is the difference between the rental value of the premises with and without the nuisance. *Francis* v. *Schoellkopf*, 53 N. Y. 152. But on the question of damages defendant should not be charged with the full amount, for I am not satisfied from the evidence but that the United States · Hotel wash-house connects with this sewer upon its private grounds, and, if so, being on private grounds, defendant's trustees have no control of that branch of sewage, and have no authority over it, and are not responsible to the plaintiffs for the damages from the sewage flowing from this place. Their act is distinct and separate from defendant's, and defendant can only be liable to the extent of the nuisance which it created. *Chipman* v. *Palmer*, 77 N. Y. 51. Then, if all the sewage affecting plaintiffs' premises did $240 damages for six years, and assuming that the United States wash-house, as nearly as can be approximated, caused one-third of this damage, then the plaintiffs should be awarded a judgment of $160, with costs."

Defendant appeals.

Argued before LEARNED, P. J., and LANDON and INGALLS, JJ.

*Wm. H. McCall,* (*Pond & Brackett,* of counsel,) for appellant. *John L. Henning,* for respondent.

LEARNED, P. J. This is an action to restrain the defendants from discharging the contents of a sewer into a natural stream, which, after receiving such contents, passes through plaintiffs' land. There seems to be no dispute that the sewer does so discharge its contents, and that the result is injurious to plaintiffs' land. The defendant insists that the sewer is not a public sewer; does not belong to defendant; and that defendant is not responsible for its construction or for the consequent damages. The sewer runs through Lawrence and Harrison streets to Division; thence through private grounds to Walworth, in which street it connects with the aforesaid stream, (called "Waterbury Brook.") That stream, passing along Walworth street, turns and crosses plaintiffs' land. The sewer was built under a contract made by the defendant with one Adams in 1876, and the specifications provide for the connection with the Waterbury brook. This contract purported to be made under chapter 271, Laws 1874, §§ 3, 4. The defendant insists that the sewers therein provided for are private, because the expense is to be assessed on adjoining owners; and also that the petition was not in conformity with the act, because the sewer was partly on private property.

As to the sewer being partly on private property, it may be that the owners of such property might have objected to its construction. But they have not, and the sewer has been built. The defendant by this objection says to plaintiffs that it is not liable for injury to her land, because for the purpose of doing such injury the defendant trespassed on some other person's land. That is a poor excuse.

Again, the contract for building the sewer was made by defendant. It is immaterial, then, so far as these plaintiffs are concerned, whether the defendant was or was not to be reimbursed by assessments on adjoining owners. The costs of improvements are often assessed on the land benefited, but yet the making of the improvement is the act of the municipality. If the whole of this sewer were on private land, then it might be improper to adjudge that the defendant should close or stop it, because they might have no right to enter on private land. But much of the sewer is in the street, and is therefore within defendant's control. When the defendant shall have done all in its power to prevent the injury which the plaintiffs suffer, it will then be time to inquire whether any others are injuring her land.

Nor can the defendant protect itself on the ground that the petition for this sewer was not such as to authorize defendant to construct it. If the defendant had no right to cause sewage to be discharged into a brook crossing plaintiffs' lot, it is no defense to say that the defendant had no right at all to construct the sewer.

The defendant insists, further, that it is not liable because the injury arises from the use of the sewer by third persons who connect with it their privies and water-closets. But such was the very object of the sewer. A municipality does not (except from its own buildings) discharge sewage into a sewer, but it constructs the sewer that persons on its line may connect their houses with it, and discharge sewage into it; and it may not lawfully convey the foul material thus collected, and throw it on private property.

The defendant further urges that the injunction is wrong, because the defendant does not own and has not control over the 500 feet of the sewer which are on private property. We have above pointed out the answer to this. The defendant can control, stop up, or divert the sewer at Division street, or further up. The injunction only forbids the defendant to further allow the sewage and filth from the Lawrence-Street sewer to flow on plaintiffs' land. Lawrence street is above Division. Nothing in the injunction requires defendant not to allow sewage, if any, which enters the sewer from the private property below Division street to flow on plaintiffs' land. Whether the defendant would be liable in respect to such sewage we need not say. The referee has not held the defendant liable in respect to such sewage, and the subject is not before us. We think that the facts and the law sustain the referee's findings. The judgment is affirmed, with costs.